UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                          Chapter 11

SCRUB ISLAND DEVELOPMENT
GROUP LIMITED,                                  Case No. 8:13-bk-15285-MGW

                                                Jointly Administered with

SCRUB ISLAND CONSTRUCTION
LIMITED,                                        Case No. 8:13-bk-15286-MGW

       Debtors.
_____/

SCRUB ISLAND DEVELOPMENT
GROUP LIMITED and SCRUB ISLAND
CONSTRUCTION LIMITED,

       Plaintiffs,
                                                Adv. Proc. No. _____

vs.

FIRSTBANK PUERTO RICO,

       Defendant.
_____/

## COMPLAINT AND OBJECTION TO CLAIM

Plaintiffs, Scrub Island Development Group Limited ("SIDG") and Scrub Island Construction Limited ("SICL"), sue Defendant, FirstBank Puerto Rico ("FirstBank"), and allege as follows:

## THE PARTIES

1.      As more fully set forth below, this is an action for:

A.   damages that exceed $75,000, excluding interest, costs and attorneys' fees;

B.   equitable subordination; and

C.  disallowance of any deficiency claim on the part of FirstBank.

2.       SIDG is the debtor and debtor in possession in Case No. 8:13-bk-15285-MGW.
SIDG is a company incorporated under the laws of the British Virgin Islands and maintains its
corporate headquarters and principal place of business in Hillsborough County, Florida.

3.       SICL is the debtor and debtor in possession in Case No. 8:13-bk-15286-MGW.
SICL is a company incorporated under the laws of the British Virgin Islands and maintains its
corporate headquarters and principal place of business in Hillsborough County, Florida.

4.       FirstBank is a commercial banking institution incorporated under the laws of the
Commonwealth of Puerto Rico. FirstBank is an FDIC-insured institution, has offices and branches
in the State of Florida, and is engaged in substantial and not isolated activity within the State of
Florida.  FirstBank has appeared in this case through counsel, has sought affirmative relief from
this Court, has filed a proof of claim, and has acknowledged this Court's in personam jurisdiction.

## JURISDICTION AND VENUE

5.       This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.
§1334(b) and §1334(e).  This is a core matter within this Court's jurisdiction pursuant to 28 U.S.C.
§157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §1409.

6.       The statutory predicates for the relief sought herein include 11 U.S.C. §§ 105(a),
502, and 510, and Rules 3007, 6009, 7001, and 7013 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

7.       SIDG owns Scrub Island, a 230-acre island located in the British Virgin Islands,
where it operates the Scrub Island Resort, Spa & Marina (the "Resort").  A more detailed
description of the Resort is set forth in the Debtors' Joint Chapter 11 Case Management Summary
filed in SIDG's Chapter 11 case (Doc. No. 5).

2

8.      In addition to the operation of the Resort, additional plans for Scrub Island include the sale of real estate lots and the construction of residences (collectively, the "Scrub Island Project").

9.      SICL is a party to construction contracts for the construction of residences on Scrub Island.

10.     Beginning in 2005, SIDG's and SICL's construction, development and operational activities with respect to the Scrub Island Project have been financed by (i) advances from the shareholders of SIDG, (ii) various loans from FirstBank (collectively, the "Loans"), (iii) payments made by third parties (the "Villa Owners") in connection with the construction of villas on Little Scrub Island to be owned by them, (iv) deferral of management fees by Mainsail BVI, Ltd. ("Mainsail"), and (v) various trade creditors.  The Loans are evidenced by promissory notes executed by SIDG and/or SICL in favor of FirstBank. The Villa Owners and Mainsail (and its related entities) hold significant unsecured claims in these cases.

11.     In early 2011, SIDG and FirstBank engaged in negotiations to restructure the Loans.

12.     At that time, James Talton ("Talton") was the Project Manager of the Scrub Island Project and reported directly to Joe C. Collier III ("Collier").  Collier (through an entity owned by him) is a director of the Debtors and reports in turn to the Boards of Directors of the Debtors.

13.     As Project Manager of the Scrub Island Project, Talton was intimately involved with SIDG's operations.  Among Talton's responsibilities was the coordination, together with Collier, of the identification of investors, take-out lenders, and/or note purchasers.  Talton was integrally involved in the structuring and implementation of presentations to such parties.  In an email to a third party, Samuel Pastrana ("Pastrana"), a senior vice president of FirstBank,

described Talton's position "as right hand to Joe Collier, owner's representative at the project from the very beginning and probably the most knowledgeable person on the project in all aspects related to the planning, legal issues, governmental permits, construction costs, costs to complete, analyzes legal issues, construction contracts, pending issues with unfinished units, etc."

14.     As Project Manager, Talton enjoyed access to confidential and proprietary information of SIDG and SICL, and was privy to (i) communications among the shareholders and directors of SIDG, (ii) privileged attorney–client communications with counsel to SIDG, and (iii) communications with prospective investors, lenders, and note buyers.  In his capacity as Project Manager, he regularly communicated with counsel for SIDG and SICL.  At FirstBank's direction, Talton disclosed confidential proprietary information of SIDG and SICL with FirstBank and with third parties without SIDG or SICL's consent.

15.     At all material times, Talton owed SIDG both (a) fiduciary duties of loyalty, diligence, and due care and (b) contractual duties based upon the terms of his employment with SIDG.  Without limitation, Talton pledged as an employee and officer to conduct himself with "honesty and integrity" in everything he did for SIDG.

16.     FirstBank knew of the fiduciary and contractual relationships between Talton and SIDG.

17.     In 2012, Talton was earning in excess of $200,000 a year, plus fringe benefits.

18.     During the workout negotiations in 2011, Talton met often with both United States and BVI counsel for the Debtors as a client representative and discussed strategy and legal theories with them.

19.     A workout agreement was executed by the Debtors and FirstBank on or about June 10, 2011 (the "Workout Agreement").  The Workout Agreement is attached hereto as Exhibit A.

20.     Pursuant to (a) the terms of the Workout Agreement, (b) SIDG's assumption that FirstBank was acting in good faith, and (c) assurances from FirstBank that it would work cooperatively with SIDG and SICL, SIDG and SICL undertook and incurred numerous obligations thereunder for the benefit of FirstBank, one of which was obtaining an affiliation with Marriott International, Inc. ("Marriott") for inclusion of the Resort in the Marriott Autograph Collection Hotel system.  Before the Resort could become a Marriott Autograph Collection Hotel, SIDG and SICL were required to make substantial improvements to the Resort to comply with Marriott's requirements. FirstBank's appraiser acknowledged in early 2012 that the "Resort property has benefitted from the recent (December 2011) affiliation with Marriott with this franchise's new concept known as the 'Autograph' program."

21.     In further reliance upon the Workout Agreement, FirstBank's explicit multiple assurances, and the presumed good faith of FirstBank in honoring the agreement, SIDG obtained additional equity infusions and extensions of credit, expended funds and incurred debt that it would not have otherwise spent, and continued to employ Talton at a high annual salary.

22.     Subsequent to execution of the Workout Agreement, FirstBank requested that SIDG and its affiliates find a third party who would either pay off or acquire the Loans and advised SIDG that FirstBank would accept a substantial discount on the outstanding amount of the Loans to sell or satisfy the Loans.  Among other things,  FirstBank advised SIDG that it had written the Loans down to $40 million and would accept and partially finance that amount, and it also encouraged SIDG to bring lower offers to it.  In accordance with this request, SIDG focused on finding a replacement lender or purchaser, not knowing that FirstBank was secretly undermining those efforts, as described below.

23.     As SIDG's efforts to find investors and to re-flag the Resort with Marriott were ongoing and while the Workout Agreement was being implemented and performed, certain officers and agents of FirstBank engaged in illegal, unauthorized, and clandestine communications and held secret meetings (including, but not limited to, secret communications through texting, personal email accounts, and clandestine meetings) with Talton, knowing that Talton's undisclosed participation in those discussions was in violation of his fiduciary and contractual duties to the Debtors and was an attempt by FirstBank to gain undue advantage over SIDG and SICL and to interfere with SIDG's efforts to secure alternative financing.

24.     In fact, FirstBank offered Talton compensation in the form of fees or commissions if he would bring a note purchaser to FirstBank independently of, and hostile to the interests of, SIDG and its creditors.  FirstBank acted willfully, maliciously, and with the purpose of solely benefitting itself to the detriment of SIDG, and it induced Talton to breach his fiduciary and contractual obligations to SIDG or, aided and abetted in such breaches and tortuously interfered with the contractual relationship between SIDG and Talton. These secret communications and meetings occurred without the authorization and knowledge of SIDG or SICL, a fact well-known by FirstBank.

25.     For example, even before January 2, 2012 (the formal opening of the Resort as a Marriott Autograph Collection Hotel), Talton had begun to breach his contractual and fiduciary duties to the Debtors, as indicated by the following exchange of text messages between Talton and Pastrana on January 2, 2012:

- Talton to Pastrana – "Ok, Joe is asking me to send him copy of everything I sent you or Falcon. *Anything that I should or should not disclose*? Everything I sent you *so far* has been through *my personal/private email*." (emphases added).

- Pastrana to Talton – "So what are you going to do?"

- Talton to Pastrana – "*I can tell him I have not responded to you yet if you want. Or I can send you a couple of things via work email address. What would you like?*"

- Pastrana to Talton – "*I think is better you say you are still gathering the input and then to copy the non-compromising answers to your mainsail corporate email as a draft and ask Joe if it is ok with him. When he clear* [sic] *everything, then send to me as the d [sic] person that is filtering the answers. What do you thing* [sic]?

- Talton to Pastrana – "Ok. Sounds good. *So, anything u get from my personal email…officially I never sent.*"

- Pastrana to Talton – "Yes. See your mainsail email."

- Talton to Pastrana – " *Can you update me after your meeting with Joe this morning*"

- Pastrana to Talton – "*Yes, I will. We will meet in a nearby restaurant by 11:30 am.*"

26.     This exchange demonstrates, inter alia, a scheme by FirstBank to induce Talton to deceive Collier and the Debtors by manufacturing false statements or stories that they would jointly make to Collier.  Later emails contain similar agreements to concoct false stories.

27.     To obtain Talton's illicit cooperation and the accompanying confidential information from Talton, FirstBank induced Talton by payment of Talton's expenses, offering to employ Talton as the project manager for FirstBank following any foreclosure, and payment to Talton of a commission upon a sale of FirstBank's notes or the collateral.

28.     Continuing the pattern of illicit and illegal communications and conspiracies between Talton and Pastrana (and others at FirstBank), on April 2, 2012, Pastrana approached Talton about obtaining assistance from another business associate of the Debtors (and a villa owner at the Resort), Jennifer Williams, and asked Talton for his advice.  After humorously chiding Pastrana for sending the email to his corporate email ("Not used to answering that type question via my mainsail email.  Are u loosing your edge?  ja ja"), Talton counseled that Williams might be "on a fact finding mission for Joe Collier" and that he would "feel more comfortable if she signs a confidentiality agreement between her and the bank that include confidentiality from

the developer/borrower" and that "she should not KNOW that you KNOW that I will leave…that's

what should not get back to Joe."

  29. On numerous occasions, Talton sent materials to Pastrana with the admonition that

they should not be shared with Collier or the Debtors, including communications containing the

following statements:  (typographical and grammatical errors appear in the original):

- April 17: "*Please don't share the attached* BUT thought you might like!"

- April 19: "So you should have really, really liked the worksheet I sent you!!"

- May 4: "*Please do not share this with Joe*."

- May 5: "As discussed, the attached worksheet (in PDF) *has not been shown to Joe*."

- July 14: "Have you gotten a signed LOI from your buyer yet? (*Note this is my personal hotmail account*)."

- July 14:  "*Please delete this email after you read it.…THIS IS HIGH CONFIDENTIAL as Joe expressly[sic]  not to tell you the following*. . . . Please remember that you cannot take any specific action based on what I say so that *he does not know I am feeding you this information* but you can be prepared to take action based on know these events are in play or to find out from Joe what is happening."

- July 30: "*Know that Joe keeps send[ing] our attorneys a recap of every move you are making trying to establish lender liability*…his primary focus us [sic] your contact with staff…primarily Martin Smith and George."

- July 30: "*Always remember to look at the source of my emails to you*…if the source is mainsailhotels.com that means I am communicating in my official capacity as Mainsail…*if from Hotmail…that's personal. Be careful to respond accordingly. Everything working great so far and don't want to slip up now*."

- August 17:"*Do NOT let Joe trick u!!!* He was here *trying to get info about discussions u and I have had* and *I told him nothing* outside the Ralph Gregory discussions."

- September 7: "Joe just walked in on me again and said not to talk to u over the weekend."

- December 17 (marked *Very Confidential** ):  "*No one at SIDG or Mainsail has the attached.  Please keep confidential* and ensure your buyer keeps strictly confidential" [To which Pastrana replies, "Good.  *It will be kept confidentially*."]

- January 8, 2013: "*Joe has forbidden anyone from sharing info with you until he personally*

*oks it* and so Bettina cant respond to you via mainsail email and I do not want to put her in jeapordy *so I will be sending those to you today*."

30.     These communications were greeted by assurances from Pastrana that the communications would be kept secret, such as the following:

- April 28: "I *urgently need to corroborate or to obtain certain specific information* regarding the development of Scrub.…*As always your help will be kept confidential*"

- May 7: "*This is very confidential*."

- September 3: "Lets talk business tomorrow. Very important. *For your eyes only*. I will call you"

- September 7: "What do you think about my *"innocent"* message to Joe?"  [To which Talton responded, "I think its fine…send it. Make sure it sounds like you" – suggesting that Talton had a hand in ghost-writing the "innocent" email.]

- November 29: "Can you help me to answer rush the question in red below?"

- December 4: "*For your inf* [sic] *and for your eyes only*.  Do you think that Bettina could be on the 19th and the 20th too.  I will like to have her in Merita's meeting.  The Bank can cover her flight tickets." [Precipitating a December 7 email from Talton advising Pastrana that he was lying to Collier about Bettina's participation – "Joe also asked if Bettina was going at the same time I was going and I told him I did not know but that I could confirm with Bettina later today."   Bettina was a subordinate employee to Talton with the Debtors."]

- December 15: "Please help him rush with these question"

31.     Not all written communications have yet been produced.  In addition to the email and text messages, the communications mention in-person meetings and telephone calls between Talton and Pastrana. At least one of these communications reflects that Talton was passing on the Debtors' attorney-client communications to FirstBank.

32.     The pattern of deception and fraud is also exemplified by events in the Summer  of 2012, at which time Collier received a call from one of the unsecured creditors who told Collier that he had heard something disturbing from Sotheby's representative located on Scrub Island who had told him that Talton was conspiring against the Debtors.  Although Collier doubted this report,

he tracked Talton's travel and discovered that he had traveled to New York City to meet "investors" and then had lied about the trip.  The New York meeting actually had been arranged by FirstBank for the purpose of introducing Talton, as a bank representative, to a third party negotiating with FirstBank (but not with the Debtors).  When questioned, though, Talton concocted a false explanation and then alerted Pastrana to the fact.  When Collier then contacted Pastrana and expressed concerns about Talton, Pastrana deliberately lied, denied knowledge of the meeting, and vehemently supported Talton and said that Collier should trust him and not fire him.  Collier's concerns were allayed, and Talton continued.  Subsequently, Pastrana bragged to Talton that he had saved his job. The potential note purchasers being solicited by Talton in New York (and on other occasions) were not investors who had SIDG's best interests in mind. Rather, FirstBank and Talton were only concerned with their interests.  Talton was to receive compensation in connection with any such note purchase orchestrated with FirstBank.

33.     During this period of time, Talton was secretly supplying privileged and confidential information to Pastrana and FirstBank. Talton responded quickly to information requests made by FirstBank through his private email account, however, on numerous occasions, access to the same information was denied or substantially delayed to Collier and SIDG.

34.     For a period of at least fourteen months, therefore, First Bank willfully and maliciously continued fraudulent and illegal activities that completely tilted the normal arms' length borrower-lender relationship in favor of FirstBank.  During this fourteen month period, Pastrana (while surreptitiously communicating with Talton) also regularly communicated directly with Collier.  Never during these discussions did Pastrana ever disclose to Collier the existence or nature of his communications with Talton, and in fact Pastrana deliberately and intentionally kept the communications secret from Collier.  The Debtors had worked to accomplish everything in the

Workout Agreement but were hindered, because First Bank, through Talton, was already working against them and was promised by FirstBank that he would profit from a default and a foreclosure.

35.     All conditions precedent to the maintenance of this action have been performed, have occurred or have been waived.  The events and communications giving rise to this Complaint largely took place within the State of Florida.

### DISCOUNTED PAYOFF AGREEMENT, FIRSTBANK'S SUBSEQUENT SILENCE, AND THE INITIATION OF LEGAL PROCEEDINGS

36.     As part of the Workout Agreement, SIDG was required to perform and satisfy certain obligations, including ensuring that the Resort became a Marriott Autograph Collection Hotel.  In connection with the Workout Agreement, FirstBank requested that SIDG replace it as the lender of the Scrub Island Project or that SIDG arrange the purchase of the Loans. Accordingly, SIDG expended significant time, money, and efforts to secure a mutually acceptable replacement lender or purchaser of the Loans.  SIDG also continued to compensate Talton expecting that he was fulfilling his contractual and fiduciary obligations.

37.     After finally discovering FirstBank's inappropriate and unauthorized secret communications and meetings with Talton, SIDG terminated Talton in February, 2013, and SIDG's counsel hired experts to retrieve his electronic communications with FirstBank. The discovery of the unauthorized communications and meetings further underscored the necessity of finding a permanent solution to the FirstBank lending relationship and led to discussions with FirstBank.

38.     FirstBank repeatedly requested, and indeed insisted that, as a condition to further discussions, SIDG first execute a general release in its favor.  SIDG refused to do so absent a global settlement, and no release has been given.  FirstBank also continued to request that SIDG

and its affiliates find a third party who would either pay off or acquire the Loans at a substantial discount on the outstanding amount of the Loans.

39.     During late October 2013 (and prior to the filing of the BVI Action), FirstBank agreed to accept a total payment of $40 million (and under certain circumstances, a lesser amount) to either (a) release and satisfy the Loans with SIDG and SICL, or (b) transfer its liens, claims, charges, and Loans to a third party purchaser procured by SIDG.  FirstBank also agreed (i) to give SIDG the exclusive right until June 30, 2014 to raise these funds and (ii) to provide 50% loan-to-value financing to a qualified third party note purchaser, payable over five years.  In return, SIDG agreed to substantial concessions requested by FirstBank, including investing $1.2 million of new money for the build-out and improvement of certain infrastructure items for the Resort (many of which would significantly improve cash flow at the Resort), the contribution of a $3 million Long View Villa by one of the shareholders of SIDG to be used as the new spa facility, and a release of claims against FirstBank. In consideration for the foregoing concessions from SIDG, FirstBank agreed to fund all operating deficiencies for the Resort through June 30, 2014.  All of the foregoing terms shall be referred to, collectively, as the "Discounted Payoff Offer".

40.     Although SIDG and SICL accepted the Discounted Payoff Offer (the "Discounted Payoff Agreement") prior to the filing of the BVI Action (as defined below), FirstBank nonetheless repudiated the Discounted Payoff Agreement by filing the BVI Action.

41.     While FirstBank was negotiating the Discount Payoff Offer with SIDG and SICL, FirstBank decided to secretly file an *ex parte* application in a British Virgin Islands court requesting the appointment of a temporary receiver for SIDG and SICL (the "Temporary Receiver").

42.     FirstBank sought appointment of a receiver without prior notice to SIDG or SICL or their counsel, despite numerous daily contacts between FirstBank and SIDG and their respective counsel during the time period in question.

43.     Thereafter, on November 1, 2013, the Temporary Receiver was appointed pursuant to that certain Order entered in the Eastern Caribbean Supreme Court In the High Court of Justice in the proceeding styled:  In the Matter of a Mortgagee's Claim by FirstBank Puerto Rico (the "Bank") pursuant the CPR Part 66(1)(c)(d) and (g) for the Payment of Monies Secured by Mortgage, for Possession and the Sale of Mortgaged Property by FirstBank Puerto Rico and (1) Scrub Island Construction Limited, (2) Scrub Island Development Group Limited, (3) Joe Collier, (4) CIH Loft LLC (the "BVI Action").  The BVI Action is an attempt by FirstBank to take title to SIDG's assets while wiping out all of the claims of the creditors of SIDG and SICL and all of the equity investments by the shareholders of SIDG and SICL.

44.     After SIDG and SICL discovered the filing of the BVI Action, SIDG, SICL and their counsel repeatedly attempted to contact FirstBank and its counsel regarding the Discounted Payment Agreement and FirstBank's secretive actions in filing the BVI Action.  Despite repeated attempts, FirstBank and its counsel refused to communicate with SIDG, SICL, and their counsel.

45.     As a result of the BVI Action and FirstBank's refusal to respond, on November 19, 2013, SIDG and SICL filed voluntary petitions for relief under Chapter 11 in order to protect their assets and undertakings.  In addition to protecting their assets and undertakings, SIDG and SICL took this action to protect third party creditors as it has become readily apparent that FirstBank's sole goal in the BVI Action is to eliminate all claims of creditors of SIDG and SICL.

46.     On December 9, 2013, the Court entered its Order Granting Debtors' Motion for Preliminary Injunction, enjoining FirstBank, *inter alia*, from further prosecuting the BVI Action. (Doc. No. 13).

## COUNT I – BREACH OF CONTRACT AND THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING (WORKOUT AGREEMENT)

47.     SIDG and SICL reallege and incorporate paragraphs 1 through 46 as though fully set forth herein.

48.     FirstBank breached the Workout Agreement by failing to perform thereunder and interfering with SIDG and SICL's performance thereunder.

49.     FirstBank breached its implied duty of good faith and fair dealing with respect to the Workout Agreement by, among other things, engaging in clandestine communications and secret meetings with Talton regarding SIDG's confidential strategies and proprietary materials and information in an attempt to undermine SIDG's efforts to obtain a replacement lender or purchaser of the Loans.

50.     FirstBank also breached the Workout Agreement and its obligation of good faith and fair dealing by internally deciding to end the relationship with SIDG and SICL and secretly requesting the appointment of a Temporary Receiver.  FirstBank failed to inform SIDG and SICL that it had decided to end the relationship.

51.     As a direct result of FirstBank's actions, SIDG and SICL have been damaged.

WHEREFORE, SIDG and SICL demand judgment against FirstBank for damages, costs, pre-judgment and post-judgment interest, and all such other and further relief as this Court deems just and proper.

## COUNT II – BREACH OF CONTRACT AND THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING (DISCOUNTED PAYOFF AGREEMENT)

52.     SIDG and SICL reallege and incorporate paragraphs 1 through 46 as though fully set forth herein.

53.     FirstBank breached the Discounted Payoff Agreement by refusing to sell the Loans in accordance with the agreement.

54.     FirstBank breached the implied duty of good faith and fair dealing with respect to the Discounted Payoff Agreement by filing the BVI Action after SIDG and SICL had accepted FirstBank's Discounted Payoff Offer.

55.     As a result of FirstBank's actions, SIDG and SICL have been damaged.

WHEREFORE, SIDG and SICL demand judgment against FirstBank for damages, costs, pre-judgment and post-judgment interest, and all such other and further relief as this Court deems just and proper.

## COUNT III – NEGLIGENT MISREPRESENTATION

56.     SIDG and SICL reallege and incorporate paragraphs 1 through 46 as though fully set forth herein.

57.     FirstBank made numerous misrepresentations of material fact to SIDG and SICL, including, but not limited to, (i) that it gave SIDG and SICL the opportunity to locate a mutually acceptable replacement lender or investor to purchase the Loans from FirstBank; (ii) that SIDG and SICL had until June 30, 2014 to locate a purchaser for the Loans; (iii) that FirstBank was working with SIDG and SICL to find a suitable replacement lender or investor to purchase the Loans from FirstBank; and (iv) that SIDG and SICL could accept the Discounted Payoff Offer when FirstBank had already decided to file the BVI Action.

15

58.     FirstBank failed to honor its representations by failing to afford SIDG and SICL an opportunity to locate a replacement lender or purchaser of the Loans and by internally deciding to file the BVI Action while representing to SIDG and SICL that it would agree to a discounted payoff of the Loans.

59.     FirstBank knew or reasonably should have known that the representations were false.

60.     FirstBank knew or reasonably should have known that SIDG and SICL would rely on such misrepresentations.

61.     SIDG and SICL justifiably relied upon FirstBank's misrepresentations to their detriment.

62.     As a direct result of FirstBank's actions, SIDG and SICL have been damaged.

WHEREFORE, SIDG and SICL demand judgment against FirstBank for damages, costs, pre-judgment and post-judgment interest, and all such other and further relief as this Court deems just and proper.

### COUNT IV – TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP

63.     SIDG realleges and incorporates paragraphs 1 through 46 as though fully set forth herein.

64.     At all material times, SIDG had a business relationship with Talton.

65.     FirstBank knew of the business relationship that SIDG had with Talton.

66.     FirstBank intentionally and unjustifiably interfered with SIDG's business relationship with Talton.

67.     As a direct result of FirstBank's actions, SIDG has been damaged.

WHEREFORE, SIDG demands judgment against FirstBank for compensatory and punitive damages, costs, pre-judgment and post-judgment interest, and all such other and further relief as this Court deems just and proper.

## COUNT V – CIVIL CONSPIRACY

68.     SIDG realleges and incorporates paragraphs 1 through 46 as though fully set forth herein.

69.     By clandestinely communicating and holding secret meetings with Talton, FirstBank conspired with Talton to gain unfair advantage and tortuously interfere with existing or potential business relationships of SIDG.

70.     As a direct result of FirstBank's agreement with Talton to engage in such activities, SIDG has been damaged.

WHEREFORE, SIDG demands judgment against FirstBank for compensatory and punitive damages, costs, pre-judgment and post-judgment interest, and all such other and further relief as this Court deems just and proper.

## COUNT VI – DECEPTIVE AND UNFAIR TRADE PRACTICES

71.     SIDG and SICL reallege and incorporate paragraphs 1 through 46 as though fully set forth herein.

72.     FirstBank engaged in unconscionable acts and deceptive and unfair practices in violation of F.S. § 501.204 et seq.

73.     FirstBank was engaged in trade or commerce in making the Loans and entering into the Workout Agreement.

74.     SIDG and SICL are "consumers" for purposes of F.S. § 501.201.

75.     As a direct result of FirstBank's actions, SIDG and SICL have suffered damages.

WHEREFORE, SIDG demands judgment against FirstBank for compensatory and

punitive damages, costs, pre-judgment and post-judgment interest, and all such other and further relief as this Court deems just and proper.

## COUNT VII -  EQUITABLE SUBORDINATION

76.     SIDG realleges and incorporates paragraphs 1 through 46 as though fully set forth herein.

77.     As set forth above, FirstBank made numerous affirmative representations to SIDG and SICL that FirstBank would give SIDG and SICL the opportunity to locate a mutually acceptable investor to purchase the Loans from FirstBank during the period of the Workout Agreement.

78.     Nevertheless, during the time FirstBank made these affirmative representations to SIDG and SICL, FirstBank was actually actively and secretively communicating and meeting with Talton in attempts to locate a note purchaser who was favorable to FirstBank.

79.     Furthermore, FirstBank represented to SIDG and SICL that they would have until June 30, 2014 to locate a purchaser according to the terms agreed upon under the Discounted Payoff Agreement.

80.     Nevertheless, during the time period granted by FirstBank to SIDG and SICL to locate a replacement lender or note purchaser according to the terms of the Discounted Payoff Agreement, FirstBank secretively requested the appointment of a Temporary Receiver.

81.     As a direct result of FirstBank's actions, the shareholders and creditors of SIDG and SICL have suffered harm and damages.

WHEREFORE, SIDG and SICL demand judgment against FirstBank for damages, costs, pre-judgment and post-judgment interest, and all such other and further relief as this Court deems just and proper.

## COUNT VIII -  DISALLOWANCE OF DEFICIENCY CLAIM

82.     SIDG realleges and incorporates paragraphs 1 through 46 as though fully set forth herein.

83.     The entitlement of a mortgage holder to a deficiency claim under applicable non-bankruptcy law is a matter of equity, and the court can consider equitable circumstances (such as lack of clean hands and the maxims that "one who seeks equity must do equity," and that "one who comes into equity must come with clean hands") in connection with the allowance of a deficiency claim.

84.     As set forth above, FirstBank engaged in inequitable conduct that precludes it from being awarded a deficiency claim.

WHEREFORE, SIDG and SICL demand that the Court enter a decree disallowing any deficiency claim in FirstBank's favor and awarding SIDG and SICL all warranted relief, including attorney's fees and costs, as this Court deems just and proper.

## COUNT IX – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

85.     SIDG realleges and incorporates paragraphs 1 through 46 as though fully set forth herein.

86.     Talton, as the Project Manager of the Scrub Island Project, enjoyed access to confidential and proprietary materials of SIDG, was privy to communications among the shareholders and directors of SIDG and to communications with prospective investors, and was regularly in communication with counsel for SIDG.

87.     Talton owed a fiduciary duty to SIDG and its shareholders, which duties he breached by engaging in unauthorized, clandestine and secretive communications and meetings with FirstBank and disclosing confidential SIDG information to FirstBank.

88.     FirstBank knew Talton served as Project Manager of the Scrub Island Project and owed a fiduciary duty to SIDG.

89.     FirstBank substantially assisted and encouraged Talton to breach his fiduciary duty by engaging in unauthorized, clandestine and secretive communications and meetings with Talton and disclosing confidential SIDG information to FirstBank that resulted in damages to SIDG.

WHEREFORE, SIDG demands judgment against FirstBank for compensatory and punitive damages, costs, pre-judgment and post-judgment interest, and all such other and further relief as this Court deems just and proper.

## COUNT X – PROMISSORY ESTOPPEL

90.     SIDG and SICL reallege and incorporate paragraphs 1 through 46 as though fully set forth herein.

91.     As set forth above, FirstBank made numerous affirmative representations to SIDG and SICL that FirstBank would give SIDG and SICL the opportunity to locate a mutually acceptable investor to purchase the Loans from FirstBank during the period of the Workout Agreement.  Furthermore, FirstBank represented to SIDG and SICL that they would have until June 30, 2014 to locate a purchaser according to the terms agreed upon under the Workout Agreement.

92.     SIDG and SICL reasonably relied on FirstBank's representations to their detriment.

93.     FirstBank knew or reasonably should have known that the representations were false and that SIDG and SICL would rely on such representations.

94.     As a result of such representations, SIDG and SICL relied to their detriment and have been damaged.

WHEREFORE, SIDG and SICL demand judgment against FirstBank for damages, costs, pre-judgment and post-judgment interest, and all such other and further relief as this Court deems just and proper.

## COUNT XI – OBJECTION TO CLAIM

95.     SIDG and SICL reallege and incorporate paragraphs 1 through 46 as though fully set forth herein.

96.     For the reasons stated herein, the claims of FirstBank are unenforceable against SIDG and SICL.

97.     Alternatively, the claims of FirstBank are subject to reduction.

98.     The claims of FirstBank against SIDG and SICL should be disallowed.

WHEREFORE, SIDG and SICL demand judgment against FirstBank for the disallowance of claims filed by FirstBank against SIDG and SICL, and all such other and further relief as this Court deems just and proper.


Dated:  June 24, 2014

                              /s/ Robert L. Rocke
                              Robert L. Rocke  (FBN 710342)
                              Email:  rrocke@rmslegal.com
                              Raul Valles  (FBN 148105)
                              Email:  rvalles@rmslegal.com
                              Ian A. Parry  (FBN 107040)
                              Email:  iparry@rmslegal.com
                              ROCKE, MCLEAN & SBAR, P.A.
                              2309 S. MacDill Avenue
                              Tampa, Florida  33629
                              Telephone:  813-769-5600
                              Facsimile:  813-769-5601
                              Attorneys for Plaintiffs